590 F.Supp. 217 (1984)
COALITION FOR SENSIBLE AND HUMANE SOLUTIONS, et al., Plaintiffs,
v.
Jerry B. WAMSER, et al., Defendants.
No. 84-0016 C (5).
United States District Court, E.D. Missouri, E.D.
July 11, 1984.
*218 Bruce Goldstein, Edwardsville, Ill., Ross Briggs, B. Stephen Miller, III, St. Louis, Mo., for plaintiffs.
James J. Wilson, City Counselor, Timothy G. Noble, Associate City Counselor, Julian Bush, Asst. City Counselor, Robert H. Dierker, Jr., Edward J. Hanlon, Robert F. Schlafly, Charles G. Siebert, St. Louis, Mo., for defendants.

MEMORANDUM OPINION
LIMBAUGH, District Judge.
This suit challenges the constitutionality of some of the voting registration procedures of the Board of Election Commissioners of the City of St. Louis. As the Board's procedures are constitutional, judgment will be entered in favor of the defendants.
The amended complaint consists of two counts, each with different plaintiffs. Count I contains the claims of the Coalition for Sensible and Humane Solutions ("Coalition"), an unincorporated association whose offices are located in the City of St. Louis. The Coalition is the local chapter of the People's Coalition of Missouri, a statewide organization. The plaintiff Coalition's membership consists of individuals and various organizations. The Coalition was formed to oppose governmental policies believed to be inimical to minority and low-income groups. Although the Coalition is not affiliated within any political party, membership is open to all persons; accordingly, Democrats and Republicans may join (and presumably some already have).
Count II presents the claims of Jean Townsend and a class (which has not yet been certified) of similarly situated persons. Townsend is a citizen of the United States and a resident of the City of St. Louis. She is eligible to register to vote, but is not registered. She is an unemployed, thirty-four year old grandmother.
The defendants are members of the Board of Election Commissioners of the City of St. Louis, and the Board itself. The Chairman of the Board is Jerry B. Wamser (Republican). The other Board members are Rita M. Krapf (Democrat), Jean D. Green (Democrat) and Curtis C. Crawford (Republican). The present Board members assumed their offices in the summer of 1981. Board members are appointed by the Governor and must belong to one of the two major political parties, § 115.027, R.S.Mo. 1978, which currently are the Democratic Party and the Republican Party. The Board employees must belong to one of the two major parties as well, an equal number coming from each party. § 115.047, R.S.Mo. 1978.
The Board has adopted several methods of voter registration. The primary method has been the establishment of approximately 150 permanent sites distributed through the City where persons may register. The *219 sites are located at public schools, private high schools, public libraries and the Board's downtown office. The schools are open on weekdays except for certain community schools, which are also open during some evening hours. The public libraries are open on weekdays, Saturdays, and some evenings. The Board's office is open during its daytime business hours. Registration is available at these sites during the hours they are open. Most of the schools are closed one month each summer. Registration at the schools and libraries is conducted by regular employees at those institutions, the employees being deputized as registrars under § 115.143.1, .3, R.S.Mo. Cum.Supp.1983. Registration at the Board's office is performed by its employees.
The Board also holds special City-wide registration drives. The temporary sites for the drives are supermarkets, churches and other locations with substantial traffic. Each drive lasts two days (Friday and Saturday). The drives have been held in June, 1982, October, 1983, March, 1984 and April, 1984. The October and March drives used two and three sites, respectively, in each of the City's 28 wards. The April drive used ten supermarkets spread throughout the City. The drives are publicized in advance. Registration is conducted by bipartisan teams of Board employees, chiefly election judges. The drives coincide with times of increased public interest in elections and registration.
The Board also sends out bipartisan teams of employees to register physically incapacitated persons. The registrars go to individual homes and institutions upon request.
The Board does not use a fourth available method, which is deputization of citizen volunteers. Section 115.143.2, R.S.Mo. Cum.Supp.1983, provides that the Board "may appoint any number of additional persons to serve as deputy registration officials." For several reasons, the Board refuses to exercise its discretion to deputize volunteers. First, the Board believes using volunteers would provide another opportunity for private groups to engage in vote fraud. Among other things, city-wide and ward elections are often hotly contested, some being decided by a very small percentage of the votes cast. Second, the Board believes that its policy is necessary to ensure impartiality, avoid favoritism, and prevent manipulation of the registration process by organizations. Third, the Board's policy is adopted out of concern for administrative efficiency, for the Board believes that volunteers are more likely to make administrative mistakes in registering. Budget concerns also limit the defendants' abilities to conduct special registration drives on demand and to effectively direct and monitor drives conducted by others.
In 1982, the Board did deputize volunteers from a group called the Coalition for Nonpartisan Voter Registration. This was done as an experiment. Although a number of persons were registered, the volunteers caused numerous administrative problems, including errors in filling out registration forms, delays in turning in completed forms and other problems. Shortly thereafter, canvasses of registration rolls produced an unusually high number of deletions. In contrast, the Board's own special registration drives have not had these problems, and the difference is attributable to the use of Board personnel, including election judges.
The main issue in this case is the constitutionality of the Board's refusal to deputize volunteer registrars. The Board has refused to deputize members of the plaintiff Coalition and other community groups. The Board has applied this policy consistently. Contrary to the plaintiffs' allegations, the Board does not refuse to deputize volunteers because its members wish to discourage minority and low-income persons from registering, or because the Board members wish to advance partisan interests at the expense of the political views of others. Instead, the Board refuses to deputize volunteers for the three reasons mentioned previously: prevention of *220 fraud, ensuring impartiality and administrative efficiency.

Count I
Count I alleges that the Board's refusal to deputize members of the Coalition as registrars violates various constitutional rights, the principal ones of which are First Amendment guarantees of free speech, expression and association, and due process of law and equal protection of the laws. The Coalition argues that a compelling state interest for the Board's policy must be shown and that such a compelling interest does not exist. Count I essentially requests an injunction ordering that members of the Coalition be deputized as registrars.
The Coalition's First Amendment claim is based essentially on four points. First, the members of the Coalition have a right to speak, as registrars, to unregistered individuals, particularly low-income and minority persons. Second, the Board's policies prevent the Coalition and its members from engaging in voter registration. Third, the Board uses Democratic and Republican election judges and other Board employees as registrars. Fourth, the Board's registration policies limit the number of persons eligible to vote on issues of concern to the Coalition.
The first point is not a valid First Amendment claim. "[T]here is no right, in the abstract, to be appointed to a public office such as that of voter registrar...." Rhode Island Minority Caucus, Inc. v. Baronian, 590 F.2d 372, 376 (1st Cir.1979). An election board need not conduct registration through citizen volunteers. If the Coalition and its members wish to urge persons to register, they may freely do so in their individual capacities. The fact they cannot do so in the official capacity of registrar does not unconstitutionally burden their right of free speech. Cf. Clements v. Fashing, 457 U.S. 957, 973, 102 S.Ct. 2836, 2849, 73 L.Ed.2d 508 (1982) (appellees' constitutional claim failed because they did not show that "the challenged provision significantly impair[ed] interests protected by the First Amendment.").
The second point also is not well founded. Although not affiliated with any political party, the Coalition essentially wishes for its members to be deputized in order to further the political, social and economic goals of the organization. Among other things, the Coalition believes that if its members register more low income and minority persons, legislators will be influenced to adopt the Coalition's programs. See, e.g., Miller Dep. at 45. But the First Amendment does not require that the Board support the Coalition's aims by deputizing its members as registrars. Cf. Regan v. Taxation with Representation, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (First Amendment does not require that Congress subsidize lobbying through favorable tax treatment); Perry Education Association v. Perry Local Education Association, 460 U.S. 37, 103 S.Ct. 948, 955-56, 74 L.Ed.2d 794 (1983) (school district need not allow public to use interschool mail system); P.O.W.E.R. v. Thompson, 727 F.2d 167, 172 (7th Cir.1984) (community group does not have a right to have state facilitate registration of voters likely to support organization's goals). There is no constitutional requirement that a registration system be used for political purposes. The fact that volunteers may be deputized under Missouri law does not alter this conclusion, for § 115.143.2 leaves this decision to the discretion of local election authorities.
On the third point, the Coalition argues that the Board gives preferential treatment to Democrats and Republicans. In the Board's special drives, the registrars are primarily election judges, who, like all other Board employees, are required by statute to belong to one of the two major parties. § 115.081, R.S.Mo.Cum.Supp. 1983; § 115.083, R.S.Mo.1978. Relying on cases such as Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), and Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), the Coalition argues that its non-partisan members are unconstitutionally excluded from being registrars *221 on the basis of their political affiliation.
It is rather clear from the record that the election judges are public employees, not independent contractors, so Branti and Elrod are potentially applicable. See Fox & Co. v. Schoemehl, 671 F.2d 303 (8th Cir. 1982); Sweeney v. Bond, 669 F.2d 542 (8th Cir.1982), cert. denied, 459 U.S. 878, 103 S.Ct. 174, 74 L.Ed.2d 143 (1982). But Branti and Elrod are distinguishable on three grounds. First, the employees in these cases were dismissed because their government employers disapproved of their political beliefs. But the Board does not use election judges and its other employees as registrars because it wishes to advance the interests of the Republican and Democratic parties. The Board uses judges and its other employees because they are familiar with the paperwork involved and the internal workings of the election process and because the use of bipartisan teams encourages fairness in registration. This reasoning is not invalidated by the fact that registrars in schools and libraries do not work in bipartisan teams; the Board need not use only one mechanism to further the goal of fairness.
The second distinction is that the employees in Branti and Elrod were not claiming a right to use their government positions to advance the goals of their political associations. Here, the Coalition claims a First Amendment right for its members to serve as registrars in order to advance the organization's ideological goals. There is no evidence, however, that the election judges and the other Board employees use their positions as registrars to advance the interest of their parties, such as by increasing the registration of party members at the expense of other groups.
Third, the employees in Branti and Elrod had been or were about to be dismissed from their employment. They were forced to choose between their livelihood and their political associations  a choice which clearly burdened their freedom to choose the political associations to which they would belong. The situation here is quite different. Only a few Republicans and Democrats become election judges, and only some of the judges participate in each special registration drive. By not affiliating with either political party, Coalition members merely forgo the speculative possibility of some day becoming an election judge and thereafter serving in a special registration drive. The burden on associational choice is de minimis, so a compelling state interest need not be shown. Cf. Clements v. Fashing, supra, 457 U.S. at 973, 102 S.Ct. at 2849. The alleged burden is even more insubstantial because Coalition members do not have a First Amendment right to use the position of registrar to advance their organization's aims.
The Coalition also relies on the case of Preisler v. Calcaterra, 362 Mo. 662, 243 S.W.2d 62 (1951), which held that members of the Socialist Party had a constitutional right to serve as poll watchers and challengers. The Coalition argues that its members likewise have a right to serve as registrars if Democrats and Republican judges also serve. But Preisler is distinguishable. It rested in part on the principle that, under Missouri law, poll watchers and challengers are supposed to use their positions for private political purposes. 243 S.W.2d at 65-66. That is not the case with election judges and voting registrars. Furthermore, Preisler was not a First Amendment case. It was based on the perceived irrationality of a particular statute, but, as seen below, the Board's policy against deputizing volunteers is rational.
On the fourth and final First Amendment point, the Coalition argues that the Board's registration policies restrict the number of persons able to vote on issues of concern for the Coalition. In particular, the Board's policies allegedly prevent low income and minority persons from registering. Here the Coalition not only attacks the board's refusal to deputize volunteer registrars, but also it apparently contends that the board should establish more permanent registration sites and should hold more frequent special registration drives. This is not a valid First Amendment claim. *222 The Board is not required to increase the Coalition's potential audience in order to make its advocacy more effective. P.O.W. E.R. v. Thompson, supra, at 172.
Furthermore, for the Coalition to have standing to make this fourth point, it would have to show that the relief requested would increase the relative number of voters likely to support its goals. Standing requires injury caused by the defendants and redressable by the Court, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982), but the Coalition is not caused injury (in the sense of its political goals being impeded) to the extent that those who do not register are opposed to the Coalition's goals. But the First Amendment does not give the Coalition a right to have the registration process skewed in its favor. P.O.W.E.R. v. Thompson, supra, at 172.
In summary, the First Amendment does not require that members of the Coalition be deputized as registrars. This being the case, it would be inappropriate to construe the Due Process and Equal Protection Clauses of the Fourteenth Amendment as requiring a compelling state interest, for that would in effect be creating a fundamental right to be a registrar. Cf. San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (refusing to create a fundamental right to public education).
There being no infringement of a fundamental right or creation of a suspect classification, the only remaining question is whether or not there is a rational basis for the Board's policy of refusing to deputize citizen volunteers. All that is necessary is that the policy bear some "rational relationship to a legitimate state purpose." Holt Civic Club v. Tuscaloosa, 439 U.S. 60, 70, 99 S.Ct. 383, 390, 58 L.Ed.2d 292 (1978). The concerns of the Board  preventing fraud, maintaining impartiality and administrative efficiency  are all legitimate state purposes. The refusal to deputize volunteers is rationally related to these purposes, for regular employees are more accountable to the Board and have proven superior in the past. It is true, as the Coalition contends, that some jurisdictions use volunteer registrars and believe them to be successful, but it is also true that other election authorities do not. The fact that there are two sides to these questions does not mean that the defendants' policy is irrational. The Board's refusal to deputize volunteers, including members of the Coalition, is constitutional.

Count II
Count II of the amended complaint presents the claims of plaintiff Townsend. She also seeks to represent a class consisting of St. Louisians who are eligible to register to vote, but who are not so registered. She alleges that various policies of the Board infringe the right to vote guaranteed by the Equal Protection Clause of the Fourteenth Amendment. She also contends that the Board's policies violate due process and the First Amendment, but these legal theories do not add anything to her right-to-vote claim. She wishes for the Board to deputize members of non-partisan community groups as registrars. She also wants the Board to expand the number of permanent registration sites and to hold more frequent special registration drives.
"[R]estrictions affecting the right to vote must cause a discrimination of some substance before the compelling state interest test is triggered." United States v. State of South Dakota, 636 F.2d 241, 244 (8th Cir.1980), cert. denied, 452 U.S. 939, 101 S.Ct. 3082, 69 L.Ed.2d 953 (1981). Cf. McDonald v. Board of Election Commissioners of Chicago, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969) (standard of rationality, not compelling state interest, applies when voting procedures do not absolutely preclude individuals from voting); see also O'Brien v. Skinner, 414 U.S. 524, 529-30, 94 S.Ct. 740, 742-43, 38 L.Ed.2d 702 (1974). Accordingly, the Board is not required to use all practical means to register voters. As the Board's policies provide Townsend with adequate opportunities to register, her voting rights claim fails.
*223 Throughout this lawsuit, Townsend has lived at 2700a Accomac, at the corner of Accomac and Ohio. This is only three or four blocks from McKinley High School, a permanent site with six registrars. One of her daughters apparently attends McKinley. Townsend Dep. at 11-12. She also lives five or six blocks from the Barr Library, which is open for registration on weekdays, Saturdays and some evenings. Townsend claims that it would take 45 minutes to an hour to walk one way to the library, but this claim is not credible, given the short distance involved.
Townsend also is not limited to walking. She has access to and uses public transportation. She also regularly goes to church and shopping. While she does not own a car, her brother provides her with transportation on a regular basis.
Townsend also claims that she cannot register on weekdays because she must stay at home and babysit her grandchildren, but this claim is specious. Although she cannot afford to hire a babysitter, she knows other women on her block who are unregistered and who stay at home with young children. A simple solution would be for Townsend and one of the other women to take turns watching each other's children while one registers, but the women choose not to do so. The women have discussed the matter and they do not want to watch each other's children. Townsend Dep. at 30. Needless to say, this is not a problem for a federal court to solve.
Nor is Townsend a member of some racial or income group which has been discriminated against. She has a low income and is black. The amended complaint alleges that the Board's policies restrict registration by low-income and minority persons, but the facts are otherwise. Under the Board's policies, there has been an increase in the percentage of eligible voters who are registered, despite continuing efforts to update voter lists by deleting ineligible voters. Over 50,000 persons have been registered. Expert testimony establishes that registration in the predominantly black (and low-income) wards has increased from about 60% to approximately 80%. The registration rate in these wards exceeds that in predominantly white (and somewhat higher income wards). In light of these statistics and the number of available registration opportunities, the Court finds that the defendants' policies do not have a discriminatory impact on registration by minority and low-income persons, or any other socio-economic group. Furthermore, the Board's policies are not motivated by any discriminatory purpose. The Board refuses to deputize volunteers for the reasons mentioned previously and believes that present methods provide fair and adequate registration opportunities. Absent a discriminatory purpose, even a showing of a discriminatory impact would be insufficient to prove invidious discrimination justifiable only by a compelling state interest. Rogers v. Lodge, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982); Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).
Finally, Townsend has failed to show it would be any easier for her to register under one of the methods proposed by her attorneys. They propose registration at unemployment and welfare offices, but she does not go to the former and she goes to a welfare office only once every six months. They propose registration at churches, and she goes to church weekly. But we do not know if her church will have a volunteer registrar and she hardly has a right to have the Board establish a permanent site with its own employee at her particular church. Her attorneys propose having registration at supermarkets, but she claims that she goes grocery shopping only once a month, and then she goes to a farmers' market, not a supermarket. Similarly, Townsend has failed to show that it would be easier for her to register at other proposed sites, such as universities, union halls or public housing projects. It is true that Townsend would have to make a special trip to one of the Board's sites (or a side trip on the way to some other place), but that is hardly unconstitutional. Registration has long been conducted in such a manner.
Plaintiff Townsend has adequate opportunities to register. The Board has also *224 provided sufficient opportunities throughout the City for others to register, so its policies meet the standard of rationality. The Board's policies have been adopted in good faith, and not for the purpose of making it harder for some classes or groups to register to vote than for others. Given these facts, the exact number and location of permanent sites, as well as the number of special drives, are matters of administrative detail, not constitutional adjudication. After all, it is the job of the Board, not this Court (or the Coalition) to run the City's registration system. Furthermore, the Board's policy of refusing to deputize volunteers from community groups is constitutional. Townsend's constitutional rights have not been violated.
Townsend has filed a pending motion for class certification. As she does not have a valid claim of her own, she may not represent the proposed class. The motion for class certification is therefore denied.
The foregoing constitutes findings of fact and conclusions of law pursuant to F.R.Civ.P. 52. In evaluating the testimony, exhibits and other evidence, the Court has considered the parties' objections thereto and given the materials such weight as they deserve. Judgment will be entered in favor of the defendants.